***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Rowell. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rowell with minor modifications.
 ***********
The undersigned finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and the named employer.
3. The carrier liable on the risk is correctly named above.
4. The employee's average weekly wage is $579.67 per week.
5. The employee sustained a right shoulder injury on or about October 20, 1999, with the exact date to be determined by the Industrial Commission.
6. The injury/disease arose out of and in the course of employment and is compensable.
7. The parties stipulated into evidence as Stipulated Exhibit No. 1, a Pre-Trial Agreement.
8. The parties stipulated into evidence as Stipulated Exhibit No. 2, plaintiff's medical records, I.C. Forms and discovery documentation.
 ***********
Based upon all the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 38-years-old and worked for defendant-employer as a truck driver. Plaintiff was in an automobile accident in 1974, which left her with a fractured skull and a plate in her skull. On March 18, 1999, plaintiff sought treatment from Fayetteville Family Medical Center for complaints of headaches, knee pain for three months, sharp pain in her right side, and pain in both shoulders and her neck, which she had daily.
2. On October 20, 1999, plaintiff sustained injuries to her neck and shoulders as a result of pulling a tarp over a truck. Plaintiff was four months pregnant at the time of her October 20, 1999 injury and delivered her second child on March 17, 2000. Plaintiff was also pregnant again from May 2001 until February of 2002. Pregnancy alone can cause low back pain.
3. Following her October 20, 1999 injury, plaintiff sought treatment from family physician, Dr. Albert Verrilli. Plaintiff first saw Dr. Verrilli on October 26, 1999 and presented with complaints of pain in her neck and upper back. Dr. Verrilli diagnosed plaintiff with a strained trapezius muscle in the upper back. Dr. Verrilli saw plaintiff approximately 11 to 12 times between October of 1999 and May 2000, but plaintiff only made reference to her low back on one occasion.
4. On January 3, 2000, Dr. Verrilli referred plaintiff to Dr. Alexander Huff, an orthopaedic surgeon. Dr. Huff began treating plaintiff on January 10, 2000. Dr. Huff's impression was that plaintiff had a cervical strain. In June of 2000, Dr. Huff released plaintiff to full-time, light duty work, with no lifting greater than ten pounds and no driving a truck. Dr. Huff ordered an MRI exam of the shoulder, which revealed no evidence of rotator cuff tear.
5. On November 27, 2000, plaintiff saw Dr. Robert L. Allen, a neurosurgeon, on referral from Dr. Huff. Plaintiff presented to Dr. Allen with neck and arm pain and some right leg pain. Dr. Allen performed an examination of plaintiff, reviewed X-rays, and her MRI scan, and determined that plaintiff had no spinal injury and did not require any surgical intervention. Dr. Allen's determination that plaintiff had no spinal injury, included plaintiff's entire spine, her back and her neck.
6. Plaintiff presented to Dr. Carolyn Sampson, a specialist in Family Medicine, on April 23, 2001 with back pain. Although Dr. Sampson diagnosed plaintiff with chronic low back pain, her notes do not make any mention of any on-the-job injury. Dr. Sampson opined that plaintiff was capable of performing light-duty work for defendant-employer for up to twenty hours per week.
7. Plaintiff presented to Dr. Max Kasselt, orthopaedic surgeon, on May 16, 2001 and presented with complaints of shoulder, neck, and back pain. Dr. Kasselt performed an examination of plaintiff, as well as reviewed her medical records and diagnostic studies. Dr. Kasselt noted that radiographs of plaintiff's neck, shoulder, and lumbar spine were all normal. Dr. Kasselt then saw plaintiff on May 17, 2001 and determined that plaintiff had a 0% impairment rating to the shoulder and the back. Dr. Kasselt opined that plaintiff did not sustain a low back injury. Dr. Kasselt further opined that plaintiff does not require future medical treatment for her shoulders, neck, or low back. Dr. Kasselt concluded that plaintiff was malingering and that her condition involved a psychological component. Dr. Kasselt therefore referred plaintiff to Dr. Gregory Gridley for an MMPI-II psychological evaluation.
8. Dr. Gridley saw plaintiff on May 17, 2001. Based upon the results of the MMPI-II, as well as his examination of plaintiff, Dr. Gridley determined that plaintiff was malingering and that there were no physical problems that would prompt her overpresentation of pain.
9. Dr. Huff last saw plaintiff on December 3, 2001, at which point, he was of the opinion that plaintiff could return to work with no restrictions. Dr. Huff also determined that plaintiff had reached maximum medical improvement and assigned a 0% impairment rating to the shoulder.
10. Plaintiff presented to Dr. R. Ramachandran on April 29, 2002. Plaintiff presented with back, neck, and shoulder pain, and Dr. Ramachandran's initial diagnosis was possible cervical and lumbosacral radiculopathy. Dr. Ramachandran placed the restrictions on plaintiff at that time of no pushing, pulling, or lifting anything over ten pounds. Dr. Ramachandran ordered a lumbar MRI exam, which showed no herniated disc and no stenosis. Dr. Ramachandran also ordered a cervical MRI, which was negative, and he noted that plaintiff's nerve conduction studies were normal. Dr. Ramachandran did not recommend any further neurological treatment, and he testified at his deposition that he would not recommend that plaintiff see another orthopaedist for treatment.
11. On January 31, 2001, plaintiff was in a Burger King when she developed pain everywhere in her body and had to be taken by ambulance to the Emergency Room. Plaintiff reported to the Emergency Room doctor that her pain had gotten worse when playing on a playground with her son that day when she bent over. She further indicated that her pain lasted a few seconds or a few minutes and then went away as suddenly as it started.
12. The competent evidence in the record establishes that Plaintiff saw Dr. Verrilli approximately 11 to 12 times between October of 1999 and May of 2000 but only made reference to her low back on one occasion. Likewise, plaintiff began treating with Dr. Alexander Huff in January of 2000 but did not report any complaints of low back pain until June 5, 2000, approximately 8 ½ months after the October 20, 1999 injury. Plaintiff saw Dr. Robert Allen in November of 2000 but did not report that she was pregnant when she injured herself in October of 1999, or that she sought medical treatment for a number of conditions in March of 1999, or that she was involved in an automobile accident and suffered a skull fracture in 1974. Plaintiff then saw Dr. Max Kasselt, and Dr. Kasselt noted that plaintiff was malingering and that there was no objective evidence to substantiate her subjective complaint. Dr. Kasselt testified that it was his opinion that plaintiff did not sustain a low back injury. Dr. Gregory Gridley is also of the opinion that plaintiff was malingering and that there were no objective findings to substantiate her subjective complaints.
13. The competent evidence in the record establishes that Dr. Sampson's opinion that plaintiff's low back condition is related to the October 20, 1999 injury is based solely on a temporal relationship between the complaints and the original injury and not on objective findings. Dr. Sampson first saw plaintiff after her October 20, 1999 work injury on April 25, 2001, but plaintiff did not report any history of how her low back pain occurred until December 18, 2001. Moreover, an orthopaedist, a neurosurgeon, an orthopaedic surgeon, a psychologist, and a neurologist have all opined that plaintiff's low back problems are unrelated to her employment with defendant-employer. Therefore greater weight is given to the testimony of these specialists than to that of Dr. Carolyn Sampson, a family practitioner.
14. Based upon the competent and credible evidence of record in this case, the Full Commission finds that plaintiff did not sustain any injury to the low back on October 20, 1999 and that plaintiff's alleged low back problems are unrelated to her employment with defendant-employer.
15. All of the physicians who have given an opinion on the issue of whether plaintiff requires future medical treatment for her neck and shoulder injuries have determined that no treatment is warranted. Specifically, Dr. Huff, Dr. Allen, and Dr. Kasselt have given opinions that plaintiff does not require any future treatment for these conditions. Dr. Ramachandran also testified that plaintiff does not need any further neurological orthopaedic treatment for her neck and shoulder injuries. Dr. Sampson testified that she would defer to the other specialists such as the orthopaedist, the neurosurgeon, and the neurologist, on the issue of whether plaintiff needs additional treatment. Therefore, by the greater weight of the medical evidence, the Full Commission finds that plaintiff does not require any future medical treatment for her neck and shoulder injuries.
16. After due consideration of the competent and credible evidence in its entirety, it is determined that defendant-employer had a position available for plaintiff which was within the restrictions that her treating physicians placed upon her. Specifically, defendant-employer had a light-duty scale house position available for plaintiff that required her to record things on a clipboard, carry a clipboard back and forth, sit and stand, and possibly carry a sample that could weigh 1 to 2 pounds. According to plaintiff's supervisor, J. W. Creech, this scale-house position was available for plaintiff subsequent to August 1, 2001, the date plaintiff stopped working for defendant-employer. Plaintiff has not been terminated by the defendant-employer, and plaintiff still remains on the defendant-employer's books as an employee.
17. Plaintiff returned to work for defendant-employer on April 23, 2001 in the scale house position. Plaintiff returned to work with the defendant-employer on April 23, 2001 making the same or greater wages she had received at the time of her October 20, 1999 compensable injury. The duties of this scale house position were within the work restrictions given to plaintiff by her authorized treating physicians. Plaintiff continued to work in the scale house position from April 23, 2001 until August 8, 2001. On August 8, 2001, the plaintiff stopped working for the defendant-employer. Following plaintiff's return to work on April 23, 2001, the defendants properly filed an I.C. Form 28T, thereby acknowledging their termination of compensation being paid to plaintiff pursuant to N.C. Gen. Stat. § 97-29. Plaintiff continued to work in the scale house position from April 23, 2001 until August 8, 2001. On August 8, 2001, the plaintiff stopped working for the defendant-employer.
18. Since defendant-employer had a position available for plaintiff which was within the restrictions that her treating physicians placed upon her, and that plaintiff stopped working for defendant-employer on August 1, 2001, the Full Commission finds that plaintiff refused suitable employment and that any disability that plaintiff may have is attributable to her refusal of suitable employment on August 8, 2001 and thereafter.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her neck and right shoulder on October 20, 1999. N.C. Gen. Stat. § 97-2(6).
2. Defendant has provided plaintiff with all medical treatment that is reasonably required to effect a cure, provide relief, and lessen plaintiff's period of disability as a result of her October 20, 1999 shoulder and neck injuries. N.C. Gen. Stat. § 97-25.
3. Plaintiff did not sustain a compensable injury by accident or specific traumatic incident to the back on October 20, 1999, and her low back condition is unrelated to her October 20, 1999 injury. N.C. Gen. Stat. § 97-2(6).
4. Defendant-employer had a suitable position available for plaintiff which was within the restrictions that her treating physicians placed upon her, and plaintiff refused same. N.C. Gen. Stat. § 97-32. Franklinv. Broyhill Furniture Indus., 123 N.C. App. 200, 472 S.E.2d 382 (1996),cert. denied, 344 N.C. 629, 477 S.E.2d 39 (1996).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for any additional benefits in this case is hereby DENIED.
2. Each side shall bear its own costs, including any unpaid expert witness fees upon proper submission to the Industrial Commission for approval.
This the ___ day of November, 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER